MAIN, Justice.[1]
Pamela Ruttenberg, Harold Rutten-berg’s widow (“Pamela”), and two of the Ruttenbergs’ three children, Warren Rut-tenberg and Jodi Ruttenberg Benck (hereinafter sometimes collective!y referred to as “the objectors”), appeal from a final judgment of the Jefferson Probate Court, granting the petition of Karl B. Friedman and Daniel H. Markstein III (hereinafter referred to individually as “Friedman” and “Markstein” and sometimes collectively as “the coexecutors”), the coexecutors of the estate of Harold Ruttenberg, for final settlement of the estate. Ruttenberg’s third child, Don-Alien Ruttenberg (“Don-Allen”), who had worked with his father in the family business, Just For Feet, Inc. (“Just For Feet”), and who was involved in civil litigation and criminal prosecution surrounding Just For Feet, did not object to the coexecutors’ administration and settlement of his father’s estate. This Court has jurisdiction. See § 12-22-20, Ala. Code 1975.
I. Facts and Procedural History
Ruttenberg moved his family to Birmingham from South Africa in 1977 and opened an athletic-shoe store known as Just For Feet. Ruttenberg met and retained Friedman to provide him with legal representation. Over the years, Friedman, and other members of the law firm of Sirote & Permutt, P.C. (“the Sirote firm”), represented Ruttenberg and members of his family in connection with both business and personal matters.
In November 1999, Just For Feet filed a petition in bankruptcy. Just For Feet’s collapse resulted from accounting and securities fraud and spawned several criminal and civil lawsuits. Following the bankruptcy filing, Ruttenberg formed Amalgamated Concepts, LLC (“Amalgamated”), and Southbay Properties, LLC (“Southbay”), to engage in the restaurant business. Amalgamated owned and operated Cooper Grill restaurants in Birmingham, Richmond, Virginia, and Destín, Florida, and breakfast restaurants in Birmingham, Montgomery, and Destín. Southbay owned the property on which the Destín, Florida, restaurants were located.
By May 2000, Friedman, who remained Ruttenberg’s close friend, had grown weary of the myriad legal issues and billing conflicts. He referred Ruttenberg to Markstein, a lawyer with the law firm of Maynard, Cooper & Gale, P.C. (“the Maynard firm”). Friedman recommended Markstein because Markstein focused his law practice on taxation and estate planning and advising family businesses and because Markstein holds an LL.M. in taxation and estate planning from Harvard Law School. Luther H. “Rusty” Dorr, Jr., also of the Maynard firm, was retained to provide legal representation to Ruttenberg and Don-Alien in the several legal actions that arose following the demise of Just For Feet.
In January 2004, Ruttenberg was diagnosed with terminal brain cancer. Rutten-berg asked Markstein to assist him with his estate planning and requested that his good friend, Friedman, be involved. Markstein recommended that Ruttenberg create a trust for his children and grandchildren, and he advised Ruttenberg to consider appointing a corporate executor, but, according to Markstein, Ruttenberg insisted that he serve. Initially, Markstein declined because he believed that Rutten-berg’s estate would involve a particularly *119 high degree of risk for the executor, but he agreed to serve on the condition that he and Friedman be named coexecutors.
Markstein drafted a will and a revocable trust for Ruttenberg. Friedman and Markstein were named coexecutors of the estate and members of the advisory committee of the trust. The revocable trust was created to manage Ruttenberg’s businesses in the event he became disabled. Ruttenberg’s estate plan provided that, upon final settlement of the estate, the remainder of the probate estate was to be transferred into the revocable trust and thereafter distributed together with the assets of the revocable trust into one trust for the benefit of Ruttenberg’s children and grandchildren and two marital trusts for the benefit of his wife, Pamela.
Ruttenberg died on December 23, 2005. His will was admitted to probate, with Friedman and Markstein serving as coex-ecutors. Ruttenberg’s will expressly authorized the coexecutors to act as attorneys and to perform legal services for the estate and provided that the coexecutors could hire additional attorneys to assist in the administration of the estate. Because the will expressly authorized the coexecu-tors to hire law firms to assist in the administration and because Ruttenberg had previously engaged the legal services of the Sirote firm and the Maynard firm, the coexecutors hired those firms to perform legal work for the estate, assigning to the Maynard firm the issues relating to Amalgamated and Southbay and the Just For Feet litigation and to the Sirote firm the preparation of the federal tax returns. The Sirote firm and the Maynard firm continued to bill the estate for legal services rendered as they had billed Rutten-berg before his death. Friedman and Markstein billed the estate separately for work performed in their capacities as coex-ecutors and in their capacities as his attorneys. Friedman maintained sole responsibility for communicating with Ruttenberg’s family, keeping them informed through numerous detailed letters, telephone conversations, and meetings.
Charles R. Goldstein, the Chapter 7 bankruptcy trustee for Just For Feet, filed a claim against Ruttenberg’s estate in the amount of $400,000,000 (“the Goldstein claim”). Knesseth Israel Temple filed a claim for $246,000 (“the Temple claim”). Bayer Properties, Inc., agent for Bayer Retail Company, LLC, filed a claim for $232,695.12, plus interest and attorney fees (“the Bayer claim”). Other claims were filed and paid.
On January 25, 2008, after more than two years of administering the estate and managing the numerous legal issues, the coexecutors petitioned the probate court for a final settlement of the estate. The coexecutors also filed three supplemental accountings. Specifically, in the petition for final settlement, the coexecutors requested: (1) approval of their actions in administering the estate; (2) an award of compensation for ordinary services in the amount of $1,200,000, including approval of a prior payment to the coexecutors of $800,000;[2] (3) an award of compensation for extraordinary services in an amount to be determined within the court’s discretion; (4) approval and an award of fees and expenses to the Sirote firm and the Maynard firm for legal services rendered by them through final settlement; and (5) the release from all further liability relating to administration of the estate.
*120 On September 22, 2008, the objectors filed an objection to the petition for final settlement. The objectors excepted to: (1) approval for previously paid ordinary compensation to the coexecutors and an award of additional compensation for ordinary and extraordinary services to the coexecu-tors; (2) approval of previously paid fees, expenses, and bonuses[3] to the Sirote firm and the Maynard firm and an award of additional fees and expenses for legal services rendered by those law firms through final settlement; (3) payment made in settlement of the Goldstein claim; (4) payment of the Temple claim; and (5) payment of the Bayer claim. The objectors contended that the coexecutors had breached their fiduciary duties to the estate and its beneficiaries by failing to keep the objectors properly informed concerning all matters, and they sought compensatory and punitive damages.
During the bench trial, which lasted nine days, the probate court heard testimony from numerous witnesses and reviewed hundreds of exhibits. After the trial, both the coexecutors and the objectors submitted briefs. On December 29, 2009, the probate court entered an opinion and order, granting the petition for final settlement, approving the accountings, and discharging the coexecutors from liability for all actions in administering the estate. The probate court found that the coexecu-tors had “fully administered the decedent’s Estate in accordance with the decedent’s Will and in the best interest of the Estate” and that the objectors’ claims were without merit.
The probate court determined that the coexecutors were entitled to be fully compensated for the risks and responsibilities they assumed in administering the estate pursuant to §§ 43-2-682 and -848, Ala. Code 1975, and awarded fees for ordinary services in the amount of $1,165,937. The court found that the coexecutors had accepted extraordinary risks and responsibilities and had achieved extraordinary results for the estate, warranting additional compensation for extraordinary services in the amount of $700,000. See § 43-2-848(b), Ala.Code 1975. The court also found the legal fees and expenses were reasonable and were properly payable from the estate pursuant to §§ 43-2-682 and -849, Ala.Code 1975. On January 29, 2010, the objectors filed a timely notice of appeal with this Court.
II. Standard of Review
The applicable standard of review in an appeal from a probate proceeding, conducted in Jefferson and Mobile counties, where the probate court has concurrent statutory equitable jurisdiction with the circuit court to hear actions concerning the administration of an estate, is well settled. See Regions Bank v. Reed, 60 So.3d 868, 878-79 (Ala.2010); Jett v. Carter, 758 So.2d 526 (Ala.1999). See also Shewmake v. Estate of Shewmalce, 940 So.2d 260, 264 (AIa.2006).[4]
*121 “The evidence in this case was presented to the trial judge in a bench trial. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate his. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)); see also First Nat’l Bank of Mobile v. Duckworth, 502 So.2d 709 (Ala.1987). As this Court has stated,
“ ‘ “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). The rule applies to “disputed issues of fact,” whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala.1995). The ore tenus standard of review, succinctly stated, is as follows:
“ ‘ “[Wjhere the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’
“Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala.2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). However, ‘that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.’ Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala.1994).”
Robinson v. Evans, 959 So.2d 634, 637 (Ala.2006).
Questions relating to the good faith and prudence of an executor in carrying out his or her duties in administering an estate are questions of fact clothed with a presumption of correctness when the ore tenus rule is applied, and a probate court’s judgment based on such findings will not be disturbed on appeal unless that judgment is clearly erroneous.
“[T]he trial judge is in the better position to judge the credibility of the witnesses and the sufficiency of the evidence. This Court will not disturb the decision of the trial court, sitting without a jury, on conflicting evidence that is partly ore tenus, unless it is contrary to the great weight of the evidence. United States Fidelity & Guar. Co. v. Armstrong, 479 So.2d 1164 (Ala.1985); Owen v. Rutledge, 475 So.2d 826 (Ala.1985); Burroughs v. Great Atlantic & Pacific Tea Co., 462 So.2d 353 (Ala.1984); First Alabama Bank of Montgomery, N.A. v. Martin, 425 So.2d 415 (Ala.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); Sams v. Byars, 207 Ala. 504, 93 So. 415 (1922). It is not our province to attempt to ascertain with mathematical certainty the specific items calculated by the trial court to reach the total assets received into the estate or the total credit due the admin-istratrix. Cf. G.M. Mosley Contractors, Inc. v. Phillips, 487 So.2d 876, 879 (Ala.1986). We cannot say that the probate court’s finding that the estate consisted of assets totalling $322,777.77, is contrary to the great weight of the evidence.”
American States Ins. Co. v. Copeland, 534 So.2d 275, 278 (AIa.1988). The extent to *122 which an executor should be compensated rests in the sound discretion of the court and is to be determined in view of all the circumstances of the case. § 43-2-848, AJa. Code 1975; Noble v. Jackson, 132 Ala. 230, 31 So. 450 (1902). See Armstrong v. Alabama Nat’l Bank, 404 So.2d 675, 676 (Ala.1981) (compensation for ordinary services); McCollum v. Towns, 456 So.2d 48, 50 (Ala.1984) (compensation for extraordinary services). The determination whether an attorney-fee award is reasonable is within the sound discretion of the trial court, and its determination on that issue will not be disturbed on appeal unless in awarding the fee the trial court exceeded its discretion. § 43-2-682 and -⅜49, Ala.Code 1975; Van Schaack v. AmSouth Bank, NA., 530 So.2d 740, 749 (Ala.1988) (providing nonex-haustive list of criteria for evaluating whether an attorney-fee award is reasonable); and Dent v. Foy, 214 Ala. 243, 107 So. 210 (1925).
III. Fiduciary Duty of Coexecutors and Alleged Conflicts of Interest
The personal representative of the estate is either the administrator, in the case of an intestate estate, or the executor, in the case of a testate estate. § 43-8-1(24), Ala.Code 1975. A personal representative is a fiduciary charged with settling and distributing the estate of the decedent expeditiously, efficiently, and economically in accordance with the terms of the decedent’s will and in a manner consistent with the best interests of the beneficiaries of the estate. See § 43-2-833(a), Ala.Code 1975. Essentially, the personal representative marshals assets, identifies and honors valid claims against the estate, and distributes the balance. Consistent with his or her duty, the personal representative is required to use good faith and prudence and to preserve from depletion the total fund in which all the beneficiaries of the estate will share. Section 43-2-833(a), Ala.Code 1975, which was adopted from § 3-703(a) of the Uniform Probate Code, imposes a prudent-man standard on the personal representative in dealing with estate assets. Specifically, § 43-2-833(a) provides that the personal representative “shall observe the standards in dealing with the estate that would be observed by a prudent person dealing with the property of another....” In addition, “[i]f the personal representative has special skills or is named personal representative on the basis of representations of special skills or expertise, the personal representative is under a duty to use those skills.” § 43-2-833(a), Ala.Code 1975.
Attorneys engaged in probate work undertake to represent the personal representative of the estate; sometimes, they act in a dual capacity of personal representative and attorney. The attorney who is a beneficiary or creditor of the estate risks a conflict of interest in representing the personal representative and can be held to a more demanding standard of care than an attorney who is not a beneficiary or creditor. See, e.g., § 43-2-833(a), Ala.Code 1975. Especially in large estates, attorneys may also be engaged to assist and represent the personal representative on issues that arise in probate and in the administration of the estate. In Maryland Casualty Co. v. Owens, 261 Ala. 446, 451, 74 So.2d 608, 612 (1954), this Court recognized that “[a]n executor occupies a position of trust with respect to those interested in the estate and is the representative of the decedent, of creditors and of the legatees and distributees.” (Citing Durden v. Neighbors, 232 Ala. 496, 168 So. 887 (1936); and Amos v. Toolen, 232 Ala. 587,168 So. 687 (1936).)
Section 43-2-839, Ala.Code 1975, grants the personal representative broad power over all property in the decedent’s estate. Moreover, an extensive listing of transac *123 tions in which the personal representative can engage, without court approval, is set forth in § 43-2-843, Ala.Code 1975. The personal representative must get court approval of a limited number of actions if not otherwise expressly authorized in the decedent’s will. See § 43-2-844, Ala.Code 1975. Under Alabama law, “[i]f the exercise of power concerning the estate is improper, the personal representative is liable to interested persons for damage or loss resulting from breach of the personal representative’s fiduciary duty to the same extent as a trustee of an express trust.” § 43-2-840, Ala.Code 1975. Further, except for certain exceptions not applicable here, “any transaction which is affected by a substantial conflict of interest on the part of the personal representative, is voidable by any person interested in the estate except one who has consented after fair disclosure_” § 43-2-841, Ala.Code 1975. Rule 1.7(a), Ala. R. Prof. Cond., concerning conflicts of interest, provides:
“A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
“(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
“(2) Each client consents after consultation.”
The objectors allege that the coex-ecutors breached their fiduciary duties in several respects. The elements of such a claim are as follows: (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damage suffered as a result of the breach. See Hensley v. Poole, 910 So.2d 96, 106 (Ala.2005).
IV. Objectors’ Claims
A. The Goldstein Claim
The objectors contend that the co-executors breached their fiduciary duties to the estate in their handling of the Gold-stein litigation and settlement, claiming that the coexecutors should pay the estate $7,500,000 and forfeit compensation for their services because they did not pursue a claim for contribution against Don-Alien for half of the Goldstein settlement amount. More particularly, the objectors contend that, had the coexecutors not allowed Don-Alien to be represented by Friedman and the Maynard firm as a code-fendant with the estate, the estate somehow would have been able to settle with Goldstein for less than $15,000,000.
After Just For Feet filed for bankruptcy, several criminal and civil lawsuits were filed against various parties, including Rut-tenberg and his son, Don-Alien. One of those civil cases was a lawsuit filed in 2001 by Goldstein, the Just For Feet bankruptcy trustee, on behalf of the company, against its former directors and officers and Deloitte & Touche, LLP, its accounting firm, and several partners and/or employees of the accounting firm. Rutten-berg and Don-Alien were jointly named as defendants in several counts alleging breach of fiduciary duty, corporate waste, and fraud.[5] All the joint counts were based on the allegation that Ruttenberg, Don-Alien, and others had participated in misrepresentations and omissions that resulted in a false and misleading portrayal of Just For Feet’s financial condition, concealment of the company’s insolvency, the incurring of additional debt, the failure to restructure the company’s finances or to seek the protection of the bankruptcy laws *124 in a timely fashion, and other damage.[6] By the time of Ruttenberg’s death, all the other civil lawsuits, except the Goldstein litigation, had been settled using insurance proceeds.
Dorr of the Maynard firm represented both Ruttenberg and Don-Alien in the Goldstein litigation before Ruttenberg’s death. Ruttenberg had paid all his own as well as Don-Allen’s legal fees before his death. Before he passed away, he also directed the Maynard firm to pay on Don-Allen’s behalf a fine imposed by the Securities and Exchange Commission. The Goldstein claim represented damages being sought in the Goldstein civil litigation. After the Ruttenberg estate was substituted for Ruttenberg as a party defendant in the Goldstein litigation, Dorr continued to represent the estate and Don-Alien.
Dorr advised the coexecutors that the Goldstein litigation was a serious matter and that the estate had no favorable testimony or evidence and no viable defense to the allegations by Goldstein. Instead, Ruttenberg’s deposition testimony was unfavorable, and the evidence indicated that Ruttenberg had orchestrated and directed almost every aspect of the Just For Feet accounting fraud. Dorr monitored depositions by transcript rather than by traveling the country to attend in person because the coexecutors had concluded that the additional expense would not improve the estate’s prospects in the litigation and could waste estate assets.
A mediation was conducted in the Gold-stein litigation in New York on June 15, 2006, in an effort to reach a settlement with the remaining defendants, including Ruttenberg’s estate and Don-Alien. Several of the defendants had already reached settlements with the bankruptcy trustee, including the accounting firm, which had agreed to pay $24 million. The coexecu-tors had proposed that the defendants try to settle as a group, but outside directors had rejected that approach, given that Ruttenberg appeared to have been ultimately responsible for the accounting fraud and collapse of Just For Feet.
Friedman, Markstein, Dorr, and Shaun Ramey, an attorney with the Sirote firm, who monitored the case and who kept Friedman abreast of the ongoing litigation, attended the mediation. Friedman and Markstein attended the mediation as coex-ecutors of the estate. Dorr attended as an attorney representing the estate and Don-Allen. At mediation, Goldstein first offered to settle with the estate for $50,000,000, then for the value of the combined estate and revocable trust, or approximately $30,000,000. During discovery, Goldstein had obtained information regarding the value of the estate, Pamela’s assets, and the revocable trust. The coex-ecutors rejected those demands and ultimately made a final settlement offer of $15,000,000, which was accepted. Shortly after mediation, Friedman wrote a detailed, lengthy letter to Pamela and the Ruttenberg children explaining the negotiations and the settlement. In his letter, Friedman invited Pamela and the children to contact him if they had any questions. According to Friedman, he was never contacted by the heirs with questions about the Goldstein settlement.
*125 As a condition of the settlement, Gold-stein released the estate, Don-Alien, the objectors, Ruttenberg’s and the estate’s financial advisors, and the coexecutors and their law firms. In addition, the agreement required that the estate provide verification of the assets of the estate and the revocable trust. The coexecutors directed the trustee of the revocable trust to provide approximately $12,000,000 from the trust to help fund the settlement. The coexecutors then made a wire transfer of the $15,000,000 settlement amount from the estate’s bank account to Goldstein’s bank account. The settlement was paid in this manner in order to have proof of payment to show satisfaction of the Gold-stein claim.
Several witnesses testified regarding the Goldstein litigation, settlement, and claim. C. Fred Daniels testified as an expert for the coexecutors and opined that had the coexecutors not settled the Goldstein claim for substantially less than the claimed amount, the estate would have been insolvent and the trust assets would have been depleted as well.[7] Douglas Bell also testified as an expert for the coexecutors[8] and stated that the Goldstein litigation made the Ruttenberg estate a very risky and difficult estate to administer. Edward Croft, an outside director of Just For Feet, who was also a defendant in the Goldstein litigation, testified that the outside directors settled with Goldstein for $40,000,000, and paid more attorney fees and costs than did the Ruttenberg estate.
Friedman, Markstein, and Dorr, who attended the mediation, all testified that the coexecutors committed to pay the entire $15,000,000 on behalf of the estate in settlement of the Goldstein claim. They testified that no reference was ever made to Don-Allen’s paying any portion of the settlement because the payment was conditioned on everyone being released, including the eoexecutors, Ruttenberg’s financial advisors, and the objectors. Additionally, the evidence indicated that Don-Alien was incarcerated during the time of the Gold-stein mediation and that he had a net worth of only approximately $1.3 million.[9]
As to the alleged conflict of interest, the evidence indicated that Friedman and Markstein attended the mediation as coex-ecutors of the estate and that they did not represent or speak on behalf of Don-Alien. The evidence showed that the only one attending the mediation on behalf of Don-Allen was Dorr. Markstein testified that he *126 attended the mediation solely in his capacity as an executor representing the estate and that he did not represent or speak on behalf of Don-Alien. Likewise, Friedman clearly testified that he did not represent Don-Alien at the mediation. In addition, the evidence presented to the probate court demonstrated that the estate’s assets — not Don-Allen’s — were primarily sought in the Goldstein mediation. The bankruptcy trustee, through discovery, was aware that the estate and Ruttenberg revocable trust had substantially more assets than Don-Alien had individually.
With regard to the Goldstein claim, after hearing testimony and admitting documentary evidence, the probate court found that, because the Goldstein litigation threatened the solvency of the entire estate, the settlement of the action for a lesser amount while incurring minimal attorney fees resulted in significant benefit to the estate. The court concluded that the reason there were any assets at all remaining in the estate and the revocable trust was because of the extraordinary result the coexecutors had achieved in settling the Goldstein matter. The probate court determined that the objectors’ contention that the coexecutors should forgo compensation and pay the estate because they were acting under impermissible conflicts of interest while they were representing the estate was without merit. The court found that there was no conflict of interest in the representation of the estate and Don-Alien.
Upon review of the record of the trial and of the documentary evidence, we conclude that there was substantial credible evidence to support the probate court’s decision as to the Goldstein claim. The probate court heard a great deal of conflicting evidence from several witnesses about the facts surrounding the Goldstein litigation and how the Goldstein claim
should have been handled. Ultimately, the court determined that the coexecutors handling of the Goldstein matter resulted in great benefit to the estate and, most importantly, ensured the “continuing viability of the estate.” In addition, there was ample evidence before the probate court to support its factual finding that the coexec-utors did not suffer from any impermissible conflict of interest by the joint representation of the estate and Don-Alien by the Maynard firm. There was also substantial evidence to support the probate court’s rejection of the objectors’ theory that the coexecutors should have sued Don-Alien and forced him to borrow $7,500,000 from his mother in order to contribute it to the payment of the settlement of the Goldstein claim. Consequently, we conclude that the probate court did not exceed its discretion, and its judgment as to the Goldstein claim is due to be affirmed.
B. The Temple Claim
The objectors also contend that the coexecutors should have to forgo any compensation and should be required to pay the estate because (1) the Temple claim was not enforceable, or, (2) even if the pledge allegedly made by Ruttenberg during his life was a lawful debt of the estate, the coexecutors should have required Pamela to pay the pledge, or (3) Friedman, who was a member of and who served on a committee of the Temple, had a conflict of interest in approving the estate’s payment of the Temple claim.
On June 27, 2006, the Temple filed a claim against the estate for $246,000, the remaining balance of a pledge it alleged Ruttenberg made to its capital and endowment campaign. In the summer of 2003, the Temple had established a capital and endowment campaign to raise funds to build a new synagogue as well as to expand its endowment program. The cam *127 paign committee began to solicit pledges. In September 2003, the committee approached Ruttenberg and he stated that he would make a pledge of $250,000. Rut-tenberg, however, did not complete a pledge card and return it to the Temple. Ruttenberg paid $4,000 of his pledge on December 29, 2003. Thereafter, the committee had continued to seek pledges and had announced the pledges it had already-received, including Ruttenberg’s $250,000 pledge. After the committee had solicited pledges totaling a sizable amount, it found and purchased a suitable piece of property and employed an architectural firm to design plans for the construction of the new building. The committee also paid a site-evaluation firm to conduct soil and drainage testing. Additionally, the committee incurred numerous other expenses, including storage fees, legal fees, and consulting fees, as well as additional architectural and development fees.
The probate court expressly rejected the objectors’ contentions and found that the “pledge was a valid debt of the [e]state that [the coexecutors] were obligated to pay.” The court found that the coexecu-tors “should not have to forfeit any compensation or be required to pay the [estate because Friedman allegedly had a conflict of interest in approving the payment by the [ejstate of the claim filed by” the Temple because “Markstein independently approved of the [estate’s payment of the Temple claim.” In essence, the probate court concluded that, even if Friedman had a conflict of interest as to the Temple claim, Markstein did not and that the claim was a valid debt of the estate correctly approved and paid by Markstein.
The objectors essentially first aver that the pledge was unenforceable because Ruttenberg never signed a pledge card. Alabama law is clear that an unsigned pledge, when met with detrimental reliance, rises to the level of an enforceable pledge. See Pass v. First Nat’l Bank, 25 Ala.App. 519,149 So. 718 (1933) (providing that upon receipt of consideration or detrimental reliance, a charitable pledge rises to the level of an enforceable contract); South v. First Nat’l Bank, 17 Ala.App. 569, 88 So. 219 (1920). The evidence in this case showed that the Temple detrimentally relied on Ruttenberg’s pledge. The Temple had used Ruttenberg’s pledge to encourage others to donate to the campaign. The Temple even publicized Rut-tenberg’s pledge in its newsletters and other advertisements. Moreover, the evidence indicated that, before his death, Ruttenberg had even made appearances at various meetings and fund-raising activities to show his support for the campaign.
Turning to the question whether Pamela should have been required to pay the Temple claim individually, there was substantial evidence before the probate court, albeit conflicting, that, although it may have provided a tax benefit to her to pay the pledge, Pamela expressly and repeatedly asked Friedman to have the Temple claim paid by the estate. Once the coexecutors determined that the Temple claim was a lawful debt of the estate, they — not Pamela — were obligated to pay it. The evidence even showed that Pamela personally delivered the estate check to the Temple in payment of the remaining pledge amount. The evidence also showed that the decision was made to wait and pay the Temple claim after the estate-tax return had cleared because the Internal Revenue Service (“IRS”) might disallow the claim as a valid charitable contribution. It was decided that only if the IRS disallowed the claim would Pamela personally pay the claim.
As to the alleged conflict of interest in regard to the Temple claim, “[t]he *128 general rule is that the allowance or rejection of a claim against the estate by one of two or more personal representatives is binding upon the estate.” Davenport V. Witt, 212 Ala. 114, 115, 101 So. 887, 888 (1924). Davenport suggests that when one of two executors is unable to carry out a particular function because of disqualification, whether valid or not, or for other reasons, the other executor may allow or reject the claim. In addition, § 43-2-846, Ala.Code 1975, provides that one co-representative may act on behalf of the estate where there is delegation by one representative to another. In this case, where there is an alleged conflict regarding the Temple claim because Friedman served on a committee at the Temple, Markstein would be able to act on behalf of the estate in regard to the Temple claim.
Accordingly, after concluding that the Temple claim was enforceable, the coexec-utors had a fiduciary duty to pay it. Thus, the record and Alabama law amply support the probate court’s finding that any hypothetical conflict of interest did not affect payment of the Temple claim. In addition, Markstein’s independence in passing on the validity of the Temple claim buttressed the propriety of the decision to pay the claim. Thus, we conclude that the probate court’s judgment regarding the payment of the Temple claim is due to be affirmed.
C. The Bayer Claim
The objectors also contend that the coexecutors should be required to pay money to the estate and to give up all compensation because the Siroté firm allegedly suffered from a conflict of interest by representing Bayer Retail Company, LLC (“Bayer”), in an unrelated matter while Friedman was acting as an executor for the estate.
Amalgamated operated a breakfast restaurant at the Summit shopping center in Birmingham. Bayer was the landlord. In 2001, Ruttenberg had personally guaranteed the payment of rent and performance of all provisions of the restaurant lease agreement. The lease agreement provided that, in the event of default, interest, late fees, and attorney fees were chargeable. During 2005, Amalgamated sold the business and assigned the lease to a third party. In connection with the transaction, Ruttenberg agreed to guarantee one year’s rent to induce Bayer to accept the assignment of the lease. In early December 2005, before Ruttenberg’s death, the third party breached the lease, and Bayer demanded full payment of one year’s rent in the amount of $232,695.12, not including interest, late fees, or attorney fees as provided in the lease. Ruttenberg died shortly after Bayer demanded payment of rent pursuant to the guarantee. Bayer filed a claim against the estate, seeking $232,695.12, plus interest and attorney fees. Bayer filed an amended claim, seeking $232,695.12, plus interest and attorney fees, less a credit of $55,745 from the sale of the restaurant equipment.
The evidence revealed that Ruttenberg had acknowledged and confirmed the debt to Bayer before his death. Thus, the objectors do not dispute that the Bayer claim was a valid debt of the estate. Rather, the objectors dispute the eoexecutors’ payments of approximately $12,000 in interest and $15,000 in attorney fees sought by Bayer and allege that the overpayment was the result of a conflict of interest. The objectors argue that Bayer’s claim amount should have been limited to $232,695.12, the principal amount of the lease.
Here, the evidence showed that the Si-rote firm had represented Bayer for years and that the Sirote firm was representing Bayer in connection with unrelated matters while the Bayer claim was pending *129 against the estate. The evidence, however, also showed that Friedman was not involved in any way with the Bayer matters that were not related to the Bayer claim. The record shows that an attorney with the Maynard firm negotiated the Bayer obligation before Ruttenberg’s death and that Markstein relied on that attorney’s assessment of the Bayer claim in deciding to pay the claim instead of pursuing litigation over $15,000 in attorney fees and $12,000 in interest. In addition, after several discussions with Bayer’s general counsel and Bayer’s attorney, the coexecu-tors were able to reduce the attorney fees claimed from to $77,565.04 to $15,000. Ultimately, the estate paid $232,695.12, plus interest of approximately $12,000 and a $15,000 attorney fee.
The probate court found that “[t]he Bayer Properties claim was a just and valid debt of the Estate.” The court stated that the lease included interest and attorney fees in the definition of rent. The probate court found no evidence of a conflict of interest and stated that, even if Friedman had a conflict of interest because of the Sir ote firm’s prior representation of Bayer, Mai’kstein did not have such a conflict. The probate court determined that the coexecutors “made a prudent decision to compromise and pay the claim rather than expend Estate resources on paying attorneys to litigate the issue with Bayer.”
Upon our review of the evidence, including the testimony and the documentary evidence adduced at trial, we conclude that the evidence does not indicate that the probate court’s findings are erroneous. Here, the coexecutors had a fiduciary duty to pay the claim and had to determine the feasibility of litigating the attorney fee and interest portion of the claim. Given the other matters before the coexecutors in administering the estate and considering that the attorney-fee and interest provisions of the lease would likely be enforceable, we cannot say that the coexecutors’ payment of the claim, including attorney fees and interest, was not warranted. Moreover, much like the Temple claim, the involvement of the Maynard firm before Ruttenberg’s death and Markstein’s independence in passing on the validity of the claim prevented a conflict of interest. Consequently, we conclude that the probate court’s judgment regarding the payment of the Bayer claim is due to be affirmed.
V. Coexecutors Fees for Ordinary and Extraordinary Services
The objectors assert that, under the facts of this case, the fees awarded the coexecutors for ordinary services were unreasonable. The objectors likewise contend that the fees awarded the coexecutors for extraordinary services were not warranted. “The award of executor fees is largely within the discretion of the trial judge.” Armstrong v. Alabama Nat’l Bank, 404 So.2d 675, 676 (Ala.1981). Furthermore, “[t]he determination of the amount of fees to be awarded for extraordinary services rendered in administering estates rests with the trial court.” McCollum v. Towns, 456 So.2d 48, 50 (Ala.1984).[10]
Section 43-2-848 provides that executors are entitled to “reasonable compensation for services as may appear to the court to be fair .... ” § 43-2-848(a), Ala. Code 1975. In assessing the reasonableness of an executor’s compensation, Alabama courts consider the following factors:
*130 “[T]he novelty and difficulty of the administrative process, the skill requisite to perform the service, the likelihood that the acceptance of the particular employment will preclude other employment, the fee customarily charged in the locality for similar services, the amount involved and the results obtained, the requirements imposed by the circumstances and condition of the estate, the nature and length of the professional relationship with the decedent, the experience, reputation, diligence, and ability of the person performing the services, the liability, financial or otherwise, of the personal representative, or the risk and responsibility involved....”
§ 43-2-848(a). In addition, § 43-2-848(a) provides that a fee for ordinary services should not exceed “two and one-half percent of the value of all property received and under the possession and control of the personal representative and two and one-half percent of all disbursements.” § 43-2-848(a), Ala.Code 1975. Regarding compensation for extraordinary services, § 43-2-848(b), Ala.Code 1975, provides that over and above fees for ordinary services, “the court may allow a reasonable compensation for extraordinary services performed for the estate.”
The probate court determined that the coexecutors were entitled to receive $1,165,937 for their ordinary services in administering Ruttenberg’s estate. The court found that the coexecutors were both “eminently qualified attorneys who brought significant expertise and effort to bear on an estate that was extremely complicated” and that the coexecutors successfully resolved a number of “very significant challenges to the viability of the Estate,” including:
“-the management and sale of various Ruttenberg-related businesses and other assets;
“-the settlement of a major lawsuit that threatened the solvency of the entire Estate;
“-sensitive and complicated personnel and staffing issues;
“-oversight of investment assets;
“-the successful preparation of a complex and risky estate tax return;
“-the successful resolution of other creditors’ claims against the Estate; and “-the retention and management of counsel to perform various legal services necessary to administer the estate.”
The probate court also found that the co-executors performed each of those services competently and diligently and that their services resulted in significant benefits for the estate. The court further found that the objectors’ contentions were not supported by the evidence and that the factual and expert testimony presented on behalf of the coexecutors was more credible.
As to extraordinary services, the probate court determined that the coexecutors should each receive $350,000. The court recognized that the Ruttenberg estate was the type of estate for which additional compensation for extraordinary services was contemplated and stated:
“First, in gathering Mr. Ruttenberg’s assets, the Personal Representatives were required to deal with Amalgamated Concepts, LLC and SouthBay Properties, LLC as going concerns operating restaurants, a car wash and several collateral businesses in three states. The Personal Representatives negotiated and secured retention agreements with key employees, such as a Chief Operating Officer, chief and several office personnel, which agreements provided sufficient incentive arrangements to keep a competent staff in place. The Personal Representatives also directed cost-cutting measures, such as discontinuing ex *131 pensive advertising campaigns and moving the offices to a smaller space, that helped to stem multi-million dollar losses that Amalgamated had experienced for several years before Mr. Ruttenberg’s death and that returned the business to a break-even status.
“Second, the Personal Representatives faced an extraordinary and difficult claim for $400,000,000 in a lawsuit filed by Charles Goldstein (the ‘Goldstein claim’ arising out of the ‘Goldstein litigation’), the trustee in bankruptcy of Just for Feet, on behalf of the company’s creditors. The Personal Representatives settled this claim against the Estate for $15,000,000, while incurring minimal legal fees. In doing so, the Personal Representatives effectively and economically removed a contingent liability and ensured the continuing viability of the Estate. The reason that there are any assets at all remaining in the probate estate and the Revocable Management Trust is because of the extraordinary result that the Personal Representatives achieved in quickly settling this $400,000,000 lawsuit, which alleged that as founder, chief executive officer, and chairman of the board of directors of Just for Feet, Mr. Ruttenberg orchestrated and oversaw a massive accounting fraud at the company and refused to permit the company to file for bankruptcy. The Court is convinced that the Goldstein lawsuit was extremely serious: all of the witnesses and co-defendants identified Mr. Ruttenberg as the ultimate tortfeasor, and the Estate had no viable defense. The Goldstein claim easily could have exhausted all of the assets in the Estate and Revocable Management Trust, and the Personal Representatives’ decision to settle preserved approximately half of the Estate assets. The wisdom of the Personal Representatives’ decision to settle for $15,000,000 is underscored by the settlement amounts paid by the other Goldstein defendants: Deloitte & Touche and the outside directors, who were alleged to have played less central roles in the fraud and failure to file timely for bankruptcy, settled for $24,000,000 and $40,000,000, respectively.
“Another remarkable result in the Goldstein litigation was the extremely low attorneys’ fees incurred. The Personal Representatives approved cost-saving defense strategies that could have subjected the Personal Representatives to criticism for not taking every possible measure to defend the Estate. However, they were trying to preserve Estate assets and did not believe that taking a more active role would improve the Estate’s prospects in the litigation. This strategy resulted in tremendous savings to the Estate, as the total legal fees for the Goldstein lawsuit, both before and after Mr. Ruttenberg’s death, were approximately $850,000. In contrast, the outside directors paid legal fees in excess of $8,700,000 and expenses in excess of $1,300,000.
“Third, the Personal Representatives presided over the preparation of an extremely complicated estate tax return. There was a substantial risk that Mr. Ruttenberg’s advancements of approximately $20,000,000 to Amalgamated could have been recharacterized by the Internal Revenue Service as gifts, [and] the Personal Representatives were acutely aware that the Estate was at risk of being assessed gift and generation skipping taxes of more than $14,400,000. The Personal Representatives could be held personally liable for these taxes if they applied Estate assets to other debts, such as the Goldstein settlement, before satisfying the tax obligation. The Personal Representatives *132 and their legal counsel considered whether they should convert the debt to equity, and ultimately decided against this course. They directed the preparation of a return that was ‘complete in the extreme’ in hopes of avoiding an audit. Until the IRS issued a closing letter for the Estate tax return, the undocumented advances presented a huge risk to the Estate and to the Personal Representatives, personally.”
However, in order to properly determine whether the fees for ordinary services and extraordinary services were reasonable, this Court must consider other issues presented on appeal by the objectors that are encompassed in the assessment of the reasonableness of the coexecutors’ fees.
The objectors contend that the coexecu-tors improperly inflated their requested fee for ordinary services by applying the statutory percentage to assets that either should not have been included in the estate or that should have been included at a lower dollar value. In particular, the objectors challenge the coexecutors’ valuation of the receivable from Amalgamated for Rut-tenberg’s unsecured loans to the company. The objectors also contend that the funds transferred from the revocable trust to the estate that were used to pay a portion of the settlement of the Goldstein litigation should not have been included in the value of the estate for purposes of calculating the coexecutors’ fees. They also claim error because, they say, a portion of the coexecutors’ fees was paid in advance without court approval, in violation of the statutory directive. We consider these in turn.
A. Amalgamated Receivable
First, the objectors claim error in the court’s valuation of the Amalgamated receivable at $2,189,400 for purposes of calculating the fees of the personal representatives because, they say, the valuation improperly increased the coexecutors’ fees. The estate included a receivable from Amalgamated for the amount of Rutten-berg’s unsecured loans to that company. The coexecutors used a valuation from Kassouf & Company, an accounting firm. The Kassouf firm determined that if all the assets of Amalgamated had been liquidated on the date of Ruttenberg’s death, they would have generated approximately $2,100,000.
The probate court considered evidence that supported the accuracy of the Kassouf firm’s valuation of the Amalgamated receivable. Daniels, one of the coexecutors’ expert witnesses, who reviewed the valuation and found it to be reliable,[11] testified that it was reasonable and prudent for the coexecutors to rely upon the Kassouf valuation of the Amalgamated receivable. Daniels explained that based on his many experiences working with the Kassouf firm, he believed that the firm makes independent judgments as to value in its assessments. He stated that he had relied upon its valuations in many matters and had advised his clients to rely on Kassouf valuations. He testified that he believed the estate was released from $2.1 million of liability with respect to a Birmingham restaurant lease. He also opined that the estate received $151,500 for the sale of the Destín restaurant and the Destín car wash.
Wray Pearce and Lowell Womack, who testified as experts for the objectors and stated that they had not reviewed the Kas-souf valuation, testified that the Amalgamated receivable was worth zero at the time of Ruttenberg’s death. The record indicates that they based this valuation on the coexecutors’ previously valuing this receivable at zero before the Kassouf firm had *133 thoroughly conducted its valuation. The record, however, shows that the coexecu-tors ultimately sold the assets of Amalgamated in exchange for $150,000 and the release of lease obligations of more than $2,000,000.
The probate court observed the credibility and demeanor of the witnesses and considered the documentary evidence, including the estate-tax-return valuation of Amalgamated at $2,100,000, and determined that Amalgamated should be valued at $2,100,000 for purposes of calculating the coexecutors’ fee. It heard ample evidence to support its finding, and we see no reason to disturb that finding.
B. Transfer of Funds in Revocable Trust to Pay Goldstein Claim
Because the estate did not have adequate funds to pay the $15,000,000 to settle the Goldstein claim, pursuant to the terms of Ruttenberg’s revocable trust funds were transferred to the estate account from the trust. The coexecutors transferred $12,709,426.75 from the revocable trust to the estate’s bank account to fund the $15,000,000 settlement from the estate account. The objectors except to the characterization of those funds as a receipt and disbursement of the estate for purposes of calculating the coexecutors’ fees.
As we previously concluded, the Gold-stein settlement was a valid debt of the estate. In addition, several witnesses, including witnesses for the objectors, testified that all the assets of the revocable trust were at risk in the Goldstein litigation and that the coexecutors bore the full responsibility for paying the debt at issue in the Goldstein litigation and the full risk if the debt was not satisfied. Likewise, testimony indicated that it is important for executors to be able to establish proof of payment in the event they should have difficulty obtaining a satisfaction of claim and that this was more readily accomplished in this case by transferring the funds from the revocable trust to the estate account.
Bell, one of the coexecutors’ expert witnesses,[12] testified that it would have been appropriate for the coexecutors to calculate their fee based upon the entire value of the revocable trust, not just the trust funds transferred to the estate account to pay the Goldstein settlement. He stated that if a bank had served as executor of an estate similar to the Ruttenberg estate, it would have taken a fee based on the entire value of the revocable trust. He explained that as a member of the committee that had drafted Alabama’s version of the Uniform Probate Code, the intent of the committee in drafting Ala.Code 1975, § 43-2-848(a), was that compensation for executors should be based not just on the probate estate, but on every asset over which the executors have authority and liability. In addition, the objectors’ assertion that the coexecutors should have directed the trustee of the revocable trust to pay the money directly to the plaintiff in the Gold-stein litigation is without merit because that procedure, which was urged by the objectors’ expert, Pearce, would not have changed the characterization of the revocable-trust funds for fee purposes but quite possibly would have caused an issue with proof of satisfaction of the claim for both the estate and the coexecutors.
In this case, it was within the coexecu-tors’ discretion to determine how to pay the Goldstein claim, a valid claim against the estate, and the characterization of those funds as a receipt and disbursement of the estate for purposes of calculating the coexecutors’ fees was proper. The *134 facts considered by the probate court establish that the receipts and disbursements taken into consideration in determining the coexecutors’ fees should include the portion of the revocable trust that was transferred into the estate account to pay a portion of the Goldstein settlement. Thus, the probate court did not exceed its discretion in this regard.
C. Prior Court Approval Before Payment of Compensation for Ordinary Services
The objectors assert that § 43-2-844(7), Ala.Code 1975, requires prior court approval before payment to a personal representative of compensation for ordinary services and that the probate court erred in ruling that the coexecutors did not breach their fiduciary duty in paying themselves compensation for ordinary services in the amount of $800,000 without prior approval of the probate court.
The probate court ruled that the coexec-utors did not breach their fiduciary duty to the estate by paying themselves $800,000 in compensation without obtaining the probate court’s prior approval. The probate court determined that payment of a personal representative without prior court approval is allowed under § 43-2-844(7), if such payment is “expressly authorized by the will,” and it further concluded that Ruttenberg’s will “provide[d] a sufficient basis for interim payments of Personal Representative fees”; therefore the payments fell within the exemption.
During October 2006, each coexeeutor was paid $200,000, representing partial payment of personal-representative fees for ordinary services. An additional $200,000 in fees was paid to each of them in March 2007. Thus the coexecutors received fees totaling $800,000 without first obtaining the approval of the probate court.
Although the ore tenus standard of review is applicable here, because this issue presents a question of law and does not concern a disputed issue of fact, our review is de novo.
“[T]his Court reviews issues of law de novo.
‘“[W]here the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court’s judgment carries no presumption of correctness.’ Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996). Questions of law are reviewed de novo. BT Sec. Corp. v. W.R. Huff Asset Mgmt. Co., 891 So.2d 310 (Ala.2004).’
“Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Ex parte Terry, 957 So.2d 455, 457 (Ala.2006)
Section 43-2-844(7), Ala.Code 1975, states, in part: “Unless expressly authorized by the will, a personal representative, only after prior approval of court, may ... [p]ay compensation to the personal representative.” However, in this case, any error in the prior payment of coexecutors’ fees for ordinary services without prior court approval is moot. Here, the probate court took evidence and heard argument about the reasonableness of the requested fees, considered the statutory factors applicable to determining a reasonable fee, and credited the total fee awarded by the amount the coexecutors had previously paid themselves. Specifically, the probate court awarded the coexecutors $1,165,937 in fees for ordinary services and said: “$800,000 has been properly paid.... The remaining $365,937 is due to be paid in equal shares of $182,968.50.” Therefore, any error was remedied when the probate court issued its final award, after taking into consideration the statutory factors set *135 out in §§ 43-2-848 and -682, Ala.Code 1975, and then crediting the amount the coexecutors had paid themselves against the total fee awarded to the coexecutors for ordinary services.[13]
The ultimate fee approved by the probate court reflected the court’s weighing of evidence of the factors contained in § 43-2-848, including the complexity of the estate, the length of the relationship between the Ruttenberg family and the coexecu-tors, and the favorable results obtained by the coexecutors in maintaining the solvency of the estate. The coexecutors submitted substantial credible evidence of the activities they undertook on behalf of the Ruttenberg estate, as well as expert-opinion testimony of what would be reasonable fees for those services. Thus, the probate court’s judgment on the coexecutors’ fees for ordinary services is supported by substantial credible evidence and is affirmed.
D. Compensation for Extraordinary Services
The objectors claim that the probate court erred in awarding the coexecu-tors fees for extraordinary services in the amount of $700,000. In rendering the award, the probate court relied upon § 43-2-848(b), Ala.Code 1975, which provides that over and above the fees awarded for ordinary services, “the court may allow a reasonable compensation for extraordinary services performed for the estate.”
The evidence in this case supports the probate court’s determination that the risks and responsibilities assumed by the coexecutors far exceeded those in an ordinary estate administration. The coexecu-tors were charged with, among other things, settling the $400,000,000 Goldstein claim while keeping the estate solvent, managing and selling Ruttenberg’s restaurant businesses, obtaining a closing letter from the IRS on the estate-tax return as filed, which was complex, and paying the Goldstein settlement before securing a closing letter from the IRS, and avoiding potential gift taxes, interest, and penalties in excess of $15,000,000 as a result of the personal loans Ruttenberg had made to Amalgamated.
In reaching its conclusion, the probate court considered the ore tenus evidence presented by the coexecutors’ expert witnesses Daniels and Bell. Daniels testified that the coexecutors should be awarded a fee for extraordinary services in the range of $600,000 to $800,000. He opined that any executor faced with such massive liability far exceeding the value of the estate, as was the case here, would have petitioned the court to declare the estate insolvent to free the executor from the role and to allow the creditors to elect an administrator to complete the administration. Instead, the coexecutors of the Ruttenberg estate managed to keep the estate solvent, which Daniels testified he considered to be an extraordinary result, in and of itself warranting additional compensation.
According to Daniels, several other factors were exceptional and warranted extraordinary compensation. First, he testified that the Goldstein settlement was an extraordinary result because the $400,000,000 Goldstein claim could easily
*136 have exhausted all the assets of both the estate and the revocable trust. Second, Daniels testified that the coexecutors obtained extraordinary results with regard to Amalgamated because Ruttenberg had loaned Amalgamated about $11,000,000 before 2004 and had made additional cash loans of $4,500,000 per year to Amalgamated in 2004 and 2005, while the coexecutors were able to stabilize the company so that in 2006 no cash loans were made and a profit, although very small, was realized. Lastly, Daniels stated that the coexecutors should receive fees for extraordinary services where there are, as in this case, significant risks and responsibilities relating to taxes and the estate-tax return filed with the IRS. Daniels testified that the loans Ruttenberg made to Amalgamated put the coexecutors, as well as other attorneys involved in the tax preparation, at risk for the imposition of potential gift and generation-skipping taxes because the IRS could easily have determined that Rutten-berg’s cash contributions to Amalgamated were not loans, but were gifts, leaving the coexecutors and attorneys exposed and the estate insolvent. He also stated there were also other tax risks associated with Ruttenberg’s estate, such as payment of the Goldstein settlement.
Similarly, Bell, one of the expert witnesses for the coexecutors, testified that the coexecutors were due extraordinary compensation. Bell stated that the coexec-utors achieved an excellent result in a high-risk estate administration. Bell testified that most executors would have sought extraordinary compensation under these circumstances, and, in his opinion, the coexecutors were entitled to compensation for their extraordinary services in the amount of $600,000.
Generally, whether extra compensation beyond the statutory amount should be allowed and, if so, in what amount is to be decided by the probate court, and an appellate court will not disturb an executor’s award for extraordinary services unless the court exceeded its discretion in allowing the award. In this case, we cannot say that, given the evidence before us and the proportion of services performed by the coexecutors, the probate court exceeded its discretion in awarding fees for extraordinary services. Accordingly, we hold that the award of fees for extraordinary services by the probate court was proper.
VI. Legal Fees, Bonuses, and Expenses
The objectors argue that the probate court exceeded its discretion in approving and awarding payment for legal services and expenses incurred in connection with the settlement of the estate. The objectors claim error because, they say, the probate court’s ruling that the coexecutors properly billed Amalgamated for legal services performed in their capacities as attorneys for the estate was improper. The objectors also contend that the probate court erred in finding that the coexecutors did not breach their fiduciary duties in connection with the payment of bonuses to the Maynard firm and the Sirote firm in the total amount of $75,000 and in finding that those bonuses were reasonable.
In evaluating the reasonableness of an attorney fee generally, this Court has stated:
“ ‘The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and its determination on such an issue will not be disturbed on appeal unless in awarding the fee the trial court exceeded that discretion. State Bd. of Educ. v. Waldrop, 840 So.2d 893, 896 (Ala.2002); City of Birmingham v. Horn, 810 So.2d 667, 681-82 (Ala.2001); Ex parte Edwards, 601 So.2d 82, 85 (Ala.1992), citing Varner v. Century Fin. Co., 738 F.2d 1143 (11th Cir.1984).
*137 “ ‘This Court has set forth 12 criteria a court might consider when determining the reasonableness of an attorney fee:
“ ‘ “[T]he nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.”
“ ‘Van Schaack v. AmSouth Bank, N.A., 530 So.2d 740, 749 (Ala.1988). These criteria are for purposes of evaluating whether an attorney fee is reasonable; they are not an exhaustive list of specific criteria that must all be met. Beal Bank v. Schilled, 896 So.2d 395, 403 (Ala.2004), citing Graddick v. First Farmers & Merchants Nat’l Bank of Troy, 453 So.2d 1305, 1311 (Ala.1984).
“ “We defer to the trial court in an attorney-fee case because we recognize that the trial court, which has presided over the entire litigation, has a superior understanding of the factual questions that must be resolved in an attorney-fee determination. Horn, 810 So.2d at 681-82, citing Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Nevertheless, a trial court’s order regarding an attorney fee must allow for meaningful appellate review by articulating the decisions made, the reasons supporting those decisions, and how it calculated the attorney fee.
Horn, 810 So.2d at 682, citing American Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 427 (11th Cir.1999); see also Hensley, 461 U.S. at 437, 103 S.Ct. 1933.’ ”
Kiker v. Probate Court of Mobile Cnty., 67 So.3d 865, 867-68 (Ala.2010) (quoting Pharmacia Corp. v. McGowan, 915 So.2d 549, 552-53 (Ala.2004) (emphasis added in Kiker)).
A. Amalgamated Attorney Fees
The objectors claim error in the probate court’s ruling that the coexecutors properly billed Amalgamated separately for services performed by each of them in their capacities as attorneys for the estate. The objectors also assert that the estate— not Amalgamated directly — should have been billed for legal services related to Amalgamated.
The coexecutors’ law firms were paid $86,565 by Amalgamated for services rendered in connection with the management and sale of that company. The evidence showed that approximately $525,000 was transferred from the estate to Amalgamated during the administration of the estate so that Amalgamated could pay its obligations, including attorney fees. The probate court found that the coexecutors, “as attorneys, properly billed Amalgamated ... for legal services that they performed in their role as attorneys for the Estate.”
The probate court heard testimony and considered documentary evidence on this issue and found no wrongdoing. The evidence showed that when Friedman and Markstein negotiated contracts on behalf of Amalgamated they were acting in their capacities as attorneys, not as coexecu-tors. Most of the work performed by Friedman and Markstein as to Amalgamated was legal in nature and, had they not been attorneys, they would have been re *138 quired to retain attorneys to negotiate the terms and draft the contracts related to the sale of Amalgamated. In addition, the record also amply supports a basis for billing Amalgamated for attorney fees separately from the estate. The probate court heard testimony regarding why the coexecutors sought to separately account for time expended on Amalgamated. We see no reason to go behind the probate court’s finding that the coexecutors’ services with regard to Amalgamated were properly characterized and billed as legal work. To do so would require this Court to reweigh the testimony and other evidence and to sit in judgment of the credibility of the witnesses.
B. Bonuses
The coexecutors paid the Sirote firm two bonuses totaling $50,000 and the Maynard firm one bonus in the amount of $25,000. The first bonus of $25,000 was paid to both firms after the Goldstein claim was settled. The coexecutors paid a second bonus to the Sirote firm of $25,000 after the estate-tax return was approved by the IRS. The probate court determined that the bonuses paid were reasonable “in light of the skill required, exceptional services rendered and results obtained.”
As an initial matter, the objectors contend that it was a conflict of interest for the coexecutors to pay bonuses to their respective law firms. This Court, in Cashion v. Torbert, 885 So.2d 745, 753 (Ala.2003), addressed an executor-attorney conflict-of-interest situation and stated:
“[T]he fact that an executor-attorney ‘employs himself does not raise a conflict of interest and ... where an executor appointed by a will is also an attorney, there is no reason why that individual ‘shall not be allowed a reasonable compensation for his services’ rendered the estate in his capacity as attorney, so long as the services had been necessarily and bona fide rendered for the benefit of the estate.”
In Mills v. Neville, 443 So.2d 935 (Ala.1983), the Court noted that “ ‘[w]hen the executor ... is an attorney or solicitor, and in either capacity renders professional services, necessary in litigation for the benefit, or demanded by the necessities of the estate, he is entitled to compensation for such services....’” 443 So.2d at 937-38 (quoting Clark v. Knox, 70 Ala. 607, 617 (1881)). Further, the Court provided that “[e]ven where legatees have themselves been represented by counsel, an executor also acting as attorney for the estate, and thus incidentally acting for the beneficiaries, nevertheless has been allowed to recover for his 'own services as an attorney.” 443 So.2d at 938 (citing Alexander v. Bates, 127 Ala. 328, 28 So. 415 (1900)).
In addition, this Court has held that a contingency fee to be awarded on the basis that the personal representative obtained a beneficial result did not present a conflict of interest. See, e.g., Mills, 443 So.2d at 937-38. In this case, there was no conflict of interest, especially considering that Rut-tenberg’s will expressly provided that the coexecutors were authorized to retain their law firms to assist them in matters related to the administration of the estate. Moreover, the Sirote firm and the Maynard firm achieved a favorable result by settling the Goldstein claim for much less than $400,000,000 and for less than the amounts paid by other defendants in that action. The evidence also showed that the estate paid less in legal fees with regard to the Goldstein litigation than did the other defendants in that litigation. Likewise, the Sirote firm prepared the estate-tax return, which was extremely complicated and unique but which was accepted by the IRS without audit. In this case, the Sirote firm and the Maynard firm rendered services to the estate that benefited the estate. Fur *139 thermore, the probate court was aware of and approved the bonuses to the attorneys for the estate.
Additionally, the amounts paid in bonuses were reasonable. Daniels, one of the coexecutors’ expert witnesses, testified that the bonuses were modest under the circumstances of this case. Further, the fees paid by other litigants in the Gold-stein matter far exceeded the amounts paid to the attorneys representing the estate, even if $50,000 is included in the calculation of total fees paid in defending the Goldstein matter. Similarly, the evidence demonstrated that the estate-tax return was risky for the coexecutors and the attorneys who prepared the return and was quite complex.
The objectors also argue that the explanation provided by the coexecutors for payment of the bonuses was inconsistent. According to the objectors, the initial explanation was that it was simply too difficult to account for all the time spent by various members of the Sirote firm and the Maynard firm on various matters and that the bonuses were paid to capture unrecorded time expended by those firms on various estate matters. The objectors claimed that it was not until the end of the administration of the estate that they were informed that the bonuses were paid for extraordinary services performed by the Sirote firm and the Maynard firm in connection with the Goldstein claim and by the Sirote firm in connection with preparation of the estate-tax return. The probate court considered all the evidence and concluded that the bonuses were appropriate and reasonable. We cannot say that in doing so the probate court exceeded its discretion.
C. Legal Fees and Expenses Paid to the Sirote Firm and the Maynard Firm
The objectors claim that the probate court exceeded its discretion in awarding attorney fees and expenses to the coexecutors’ respective law firms. In its judgment, the probate court awarded attorneys fees and expenses as follows:
“A. With respect to Maynard, Cooper & Gale, P.C.:
“1) The Court approves fees paid by the Personal Representatives through September 30, 2006 in the amount of $126,971 .50 (including a bonus of $25,000.00) and expenses reimbursed by the Personal Representatives through September 30, 2006 in the amount of $449.03;
“2) The Court approves payment of additional, primarily pre-dispute fees ($9,380.00) through January of 2008 that were billed in February of 2008 but that remain unpaid;
“3) The Court awards payment of fees for services rendered from February 2008 through October 15, 2009 in the amount of $621,014;
“4) The Court directs reimbursement in the amount of $62,210.02 ($223.23 through January of 2008 and $61,986.79 from February 2008 through September 30, 2009) for its out-of-pocket expenses incurred through September 30, 2009; and
“B. With respect to Sirote & Permutt, P.C.:
“1) The Court approves fees paid by the Personal Representative through December 7, 2007 in the amount of $429,865.60 (including bonuses totaling $50,000.00) and expenses reimbursed by the Personal Representatives through December 7, 2007 in the amount of $12,470.46;
“2) The Court awards payment of fees of $415,954.00 for services rendered from December 3, 2007 through October 2, 2009; and
*140 “3) The Court directs reimbursement in the amount of $50,519.97 for its out-of-pocket expenses incurred through October 2, 2009.”
Under our well established standard for reviewing a trial court’s findings of fact based on ore tenus evidence, we assume that the trial court’s findings are correct, and we will not disturb a judgment based on those findings unless it is clearly erroneous. Downs v. Newman, 500 So.2d 1062 (Ala.1986). The probate court heard extensive testimony and also considered documentary evidence regarding the billings of the Sirote firm and the Maynard firm. It also heard testimony from attorneys experienced in the area of wills and estate administration regarding attorney fees customarily charged for similar services to the effect that the legal fees and expenses were reasonable in this case. Accordingly, because the evidence supports the probate court’s finding regarding attorney fees and expenses, we cannot hold that the probate court exceeded its discretion in its award of legal fees and expenses to the Sirote firm and the Maynard firm.
VII. Conclusion
Upon review of the record of the nine-day trial and the considerable documentary evidence, we hold that there was substantial evidence to support the probate court’s decision. We conclude that the probate court did not exceed its discretion. Based on the foregoing, the judgment of the probate court is affirmed.
AFFIRMED.
MALONE, C.J., and STUART, PARKER, and WISE, JJ., concur.

. This case was originally assigned to another Justice on this Court. It was reassigned to Justice Main on January 26, 2011.

. During the administration of Ruttenberg's estate, the coexecutors paid themselves $400,000 each in fees for ordinary services •without prior court approval. A portion of this amount was paid after the coexecutors achieved the settlement of the Goldstein claim.

. As discussed later in this opinion, two bonuses were paid to the Sirote firm in the total amount of $50,000, and a bonus of $25,000 was paid to the Maynard firm from the estate account. See Part VLB. of this opinion.

. See Act No. 974, Ala. Acts 1961 (regarding concurrent jurisdiction of the circuit court and probate court of Mobile County), and Act No. 1144, Ala. Acts 1971 (regarding general jurisdiction of the Jefferson Probate Court concurrent with that of the Jefferson Circuit Court, in equity, in the administration of the estate of deceased persons); the probate courts of Shelby and Pickens counties also have concurrent equitable jurisdiction where the probate judge is licensed to practice law in Alabama. See Amend. No. 758, Ala. Const, 1901 (Official Recomp., Local Amendments, Shelby County, § 4), and Amend. No. 836, Ala. Const. 1901 (Official Recomp., Local Amendments, Pickens County, § 6.10).

. The other counts named Ruttenberg individually and Deloitte & Touche, LLP, and/or its partners and employees.

. Criminal investigations were pursued against both Ruttenberg and Don-Alien. Rut-tenberg avoided prosecution because of his health. Don-Alien pleaded guilty to conspiracy to commit securities fraud and wire fraud, conspiracy to submit false statements to auditors, and conspiracy to make false entries and to aiding and abetting submitting false statements to auditors, in violation of various provisions of federal law, and he was sentenced to a prison term of 20 months and was ordered to pay a $50,000 fine.

.Daniels testified that he holds a law degree and an LL.M. in taxation and that he is currently a partner at the law firm of Cabaniss, Johnston, Gardner, Dumas & O’Neal, LLP. He stated that he has 35 years’ experience in the area of estates and trusts, starting as a trust officer for a bank, where his duties included setting and defending personal-representative fees to be charged by the bank and negotiating attorney fees with attorneys who represented estates for which the bank served as personal representative. Daniels testified that, during his years practicing law, he has focused on estates, trusts, and taxation and has been involved in setting, supporting, and contesting personal-representative fees and attorney fees for estates.

. Bell testified that he holds an MBA and a banking certificate and has worked in banking for approximately 40 years. He also served on the committee that drafted Alabama's version of the Uniform Probate Code.

. We note that the probate court found that if Don-Alien had actually borrowed $7,500,000 from his mother, Pamela, in order to pay half of the $15,000,000 Goldstein settlement, it would not have increased the money in the estate available to the other children and would only have served to recycle funds from Pamela to the marital trusts created for her benefit. Furthermore, this maneuver could have decreased the children's ultimate inheritance by the potential gift tax Pamela might be required to pay on the "loan” and/or gift to Don-Alien.

. We note that § 43-2-680, Ala.Code 1975, applicable in Armstrong and McCollum was repealed by Act No. 93-722, Ala. Acts 1993, and has been replaced by § 43-2-848, Ala. Code 1975, which was in effect in this case.

. See supra note 7.

. See supra note 8.

. The objectors cite Wehle v. Bradley, 49 So.3d 1203 (Ala.2010), as dispositive. In Wehle, the appellants argued that “the personal representatives were required to obtain prior court approval before compensating themselves out of the assets of the estate.” 49 So.3d at 1206. This Court agreed. Wehle, however, is distinguishable from this case. In Wehle, the circuit court had entered a partial summary judgment in favor of the personal representatives with regard to all compensation. The Wehle case, which was at the summary-judgment stage, was in a different posture than this case, and the circuit court in Wehle did not consider the statutory factors in determining the personal-representative fees.