MOORE, Chief Justice
(dissenting).
Larry Heath Miller was awarded attorney fees from Robert Baker and Sheila Baker and Kenneth Cooper and Barbara Cooper after the Bakers and the Coopers intervened in a dispute between Miller and his wife during divorce proceedings concerning custody of their child. The Bakers and the Coopers appealed. The Court of Civil Appeals affirmed. After granting the Bakers’ and the Coopers’ petitions for the writ of certiorari, the Court requested supplemental briefing from the parties as to whether Ex parte Handley, 460 So.2d 167 (Ala.1984), upon which the trial court appeared to rely for its award of attorney fees, should be overruled.[1] All parties responded in the negative. The Court now quashes the writs. Because I believe that Handley dangerously misconstrued the nature of equitable power and because I believe “ ‘ “[o]ur duty is to enunciate the law on the record facts” ’ ” even though “ ‘ “none of the parties declaimed the applicable law,” ’ ” Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 960 (Ala.2004) (quoting Forshey v. Principi, 284 F.3d 1335, 1357 n. 20 (Fed.Cir.2002), quoting in turn Empire Life Ins. Co. of America v. Valdak Corp., 468 F.2d 330, 334 (5th Cir.1972)), I respectfully dissent.[2]

I. Facts and Procedural History

Andrea Miller (“the wife”) filed for divorce from Larry Heath Miller (“the husband”). The husband counterclaimed for divorce and requested that the trial court order the wife to pay his attorney fees. The wife’s father and stepmother, Kenneth Cooper and Barbara Cooper (“the maternal grandparents”), moved to intervene and petitioned for custody, alleging unfitness, instability, alcohol abuse, and drug *756 abuse by both the husband and wife. The trial court granted their motion to intervene. Subsequently, the husband’s mother and stepfather, Robert Baker and Sheila Baker (“the paternal grandparents”), also moved to intervene and petitioned for custody for similar reasons. The trial court granted the paternal grandparents’ motion to intervene as well.
Upon the final judgment of divorce, the trial court awarded sole custody of the child to the husband, awarded visitation to the mother and to the maternal grandparents and the paternal grandparents, and required the maternal grandparents and the paternal grandparents each to pay $5,000 in attorney fees to the husband’s attorneys. In his objection to the maternal grandparents’ motion to intervene, the husband had claimed that he was unable to pay his attorneys and had requested attorney fees from the maternal grandparents to defend against their petition for custody. The husband also testified at trial that he was unable to pay his attorneys. The trial court’s order did not specify the legal basis for awarding attorney fees to the husband.
The maternal grandparents and the paternal grandparents (collectively “the grandparents”) appealed but challenged only the award of attorney fees. The Court of Civil Appeals affirmed the judgment of the trial court without an opinion. The maternal grandparents and the paternal grandparents then petitioned separately for a writ of certiorari, which this Court granted and now quashes.[3]

II. Standard of Review

“This Court has stated that [1] “[t]he determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and will not be disturbed ... absent an abuse of that discretion.” ’ ” Beal Bank, SSB v. Schilleci, 896 So.2d 395, 400 (Ala.2004) (quoting State Bd. of E'due. v. Waldrop, 840 So.2d 893, 896 (Ala.2002), quoting in turn Ex parte Edwards, 601 So.2d 82, 85 (Ala.1992)). However, “ ‘ “[questions of law are reviewed de novo.” ’ ” Ruttenberg v. Friedman, 97 So.3d 114,134 (Ala.2012) (quoting Ex parte Terry, 957 So.2d 455, 457 (Ala.2006), quoting in turn Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004)).

III. Discussion

“ ‘ “In Alabama and most other jurisdictions, the general rule is that attorney’s fees and expenses of litigation are not recoverable as damages, in [the] absence of a contractual or statutory duty, other than [by] a few recognized equity principles.” ’ ”[4] Tolar Constr., LEG v. Kean Elec. Co., 944 So.2d 138, 152 (Ala.2006) (quoting Ex parte Burnham, Klinefelter, Halsey, Jones & Cater, P.C., 674 So.2d 1287, 1290 (Ala.1995), quoting in turn Highlands Underwriters Ins. Co. v. Elegante Inns, Inc., 361 So.2d 1060, 1065-66 (Ala.1978)). In Handley, this Court held as a matter of first impression that a trial court “has equitable authority to grant a natural mother attorney’s fees for successfully defending an attempt by paternal grandparents to gain custody or visitation rights to minor children.” Handley, 460 So.2d at 168. I will first examine Hand- *757 ley, and then I will evaluate it by the common-law rules of equity that this Court is bound by statute to respect. § 1-3-1, Ala.Code 1975 (“The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature.” (emphasis added)).

A. Ex parte Handley

As stated above, Handley stands for the proposition that a trial court has equitable authority to grant a natural mother attorney fees for successfully defending an attempt by grandparents to gain custody of minor children. In Handley, the paternal grandparents sought custody of their grandchildren, claiming that it was not in the children’s best interests to remain with the mother. Handley, 460 So.2d at 168. The mother counterclaimed, seeking reasonable attorney fees. The trial court denied the grandparents’ request for custody and awarded the mother attorney fees. The Court of Civil Appeals reversed the award of attorney fees to the mother. Id.
On certiorari review, this Court reversed the judgment of the Court of Civil Appeals, holding as a matter of first impression that a trial court has equitable authority to award attorney fees to a mother who has successfully defended against a custody action brought by the grandparents. 460 So.2d at 168, 170. This Court reasoned that such a rule was equitable because “[i]n order to defend her right to the continued custody of her children, which the trial court determined was in their best interest, the mother was completely justified in having counsel to aid her.” 460 So.2d at 169. The Court also cited Brock v. Brock, 281 Ala. 525, 205 So.2d 903 (1968), which upheld an award of attorney fees from one spouse to another in a divorce proceeding. The Handley Court reasoned that the award in Brock “did not turn so much on the relationship of the parties as it did on the fact that the mother found it necessary to hire counsel and resort to judicial proceedings to get relief.” 460 So.2d at 170. The four dissenters, however, argued that the Court’s reliance on Brock was misplaced and accused the majority of creating a new rule as a policy matter instead of recognizing a rule in equity. 460 So.2d at 170-71 (Torbert, C.J., dissenting, joined by Faulkner, Almon, and Shores, JJ.).

B. The Metes and Bounds of Equitable Power

The question whether a trial court has equitable authority to award a prevailing parent attorney fees from unsuccessful intervening grandparents turns on the true meaning of equity. Sir William Blackstone defined equity in this manner:
“But, lastly, the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it; or the cause which moved the legislator to enact it. For when this reason ceases, the law itself ought likewise to cease with it. An instance of this is given in a case put by Cicero, or whoever was the author of the treatise inscribed to Herennius. There was a law, that those who in a storm forsook the ship, should forfeit all property therein; and that the ship and lading should belong entirely to those who staid in it. In a dangerous tempest all the mariners forsook the ship, except only one sick passenger, who by reason of his disease was unable to get out and escape. By chance the ship came safe to port. The sick man kept possession, and claimed the benefit of the law. Now here all the learned agree, that the sick man is not within the reason of the law; for the reason of making it was, to give *758 encouragement to such as should venture their lives to save the vessel: but this is a merit, which he could never pretend to, who neither staid in the ship upon that account, nor contributed any thing to it’s [sic] preservation.
“From this method of interpreting laws, by the reason of them, arises what we call equity; which is thus defined by Grotius, ‘the correction of that, wherein the law (by reason of its universality) is deficient.’ For since in laws all cases cannot be foreseen or expressed, it is necessary, that when the general decrees of the law come to be applied to particular cases, there should be somewhere a power vested of defining those circumstances, which (had they been foreseen) the legislator himself would have expressed. And these are the cases which, according to Grotius, ‘lex non exacte definit, sed arbitrio boni viri permittit.’ ”[5]
1 William Blackstone, Commentaries *61-62 (footnotes omitted). Thus, Blackstone’s understanding was not that equity gave a judge the power to create a new rule when injustice existed; rather, it gave a judge the power to correct an application of the law when the letter of the law contradicted the spirit of the law. Blackstone was very concerned about the danger of the former view. He continued:
“Equity thus depending, essentially, upon the particular circumstances of each individual case, there can be no established rules and fixed precepts of equity laid down, without destroying its very essence, and reducing it to a positive law. And, on the other hand, the liberty of considering all cases in an equitable light, must not be indulged too far; lest thereby we destroy all law, and leave the decision of every question entirely in the breast of the judge. And law, without equity, though hard and disagreeable, is much more desirable for the public good, than equity without law: which would make every judge a legislator, and introduce most infinite confusion; as there would then be almost as many different rules of action laid down in our courts, as there are differences of capacity and sentiment in the human mind.”
Id. at *61-62.[6]
Blackstone went on to say that judges could use equitable power when “some collateral matter arises out of the general words, and happens to be unreasonable.” 1 Blackstone, at *91. By the time Blackstone wrote his Commentaries, equity cases were usually limited to cases involv *759 ing property, as well as cases concerning fraud, trusts, “delivering] from such dangers as are owing to misfortune or oversight,” and cases where more specific relief was required. Id. at *92. Nevertheless, there was one anchor that held equity in its proper place so that it did not drift into the realm of the legislature, and that anchor was the legislature’s intent (or, as Blackstone called it, “the cause which moved the legislator to enact it”).
Blackstone’s definition of equity carried over into American jurisprudence. Shortly after our country’s founding, and within a decade of Alabama’s admission to the Union as a state, Noah Webster defined “equity” as follows:
“In jurisprudence, the correction or qualification of law, when too severe or defective; or the extension of the words of the law to cases not expressed, yet coming within the reason of the law. Hence a court of equity-or chancery, is a court which corrects the operation of the literal text of the law, and supplies its defects, by reasonable construction, and by rules of proceeding and deciding, which are not admissible in a court of law. Equity then is the law of reason, exercised by the chancellor or judge, giving remedy in cases to which the courts of law are not competent.”
Noah Webster, An American Dictionary of the English Language (1828).
Likewise, Justice Joseph Story’s treatise on equity reflected Blackstone’s view. Story described the jurisdiction of an equity court this way: “Perhaps the most general, if not the most precise, description of a Court of Equity, in the English and American sense, is, that it has jurisdiction in cases of rights, recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the Courts of Common Law.” 1 Joseph Story, Commentaries on Equity Jurisprudence as Administered in England and America § 33 (14th ed. 1918) (emphasis added; footnotes omitted). Story also recognized that it was an erroneous view of equity to fail, to distinguish between the “general sense of equity, which is equivalent to universal or natural justice ... [and] its technical sense, which is descriptive of the exercise of jurisdiction over peculiar rights and remedies.” Id. at § 34 (emphasis added). The United States Supreme Court has shared Justice Story’s concerns about the danger of failing to distinguish between the two senses of equity:
“ ‘If, indeed, a Court of Equity in England did possess the unbounded jurisdiction, which has been thus generally ascribed to it, of correcting, controlling, moderating, and even superseding the law, and of enforcing all the rights, as well as the charities, arising from natural law and justice, and of freeing itself from all regard to former rules and precedents, it would be the most gigantic in its sway, and the most formidable instrument of arbitrary power, that could well be devised. It would literally place the whole rights and property of the community under the arbitrary will of the Judge, acting, if you please, arbi-trio boni judiéis and, it may be, ex aequo et bono, according to his own notions and conscience; but still acting with a despotic and sovereign authority.’”
Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 332,119 S.Ct. 1961,144 L.Ed.2d 319 (1999) (Scalia, J., for the Court) (quoting 1 Joseph Story, supra at 19).
These principles also have been recognized in Alabama jurisprudence. This Court has stated:
“At the adoption of the Code, that system of equity jurisprudence and jurisdiction which, prior to the American *760 revolution, had been built upon wide and rational foundations in England, was part of our system for the administration of justice, except so far as it had been affected by our statutes.... But no part of the Code repeals that system of equity jurisprudence and jurisdiction, which it is conceded on all hands, formed part of our system when the Code was adopted.”
Waldron v. Simmons, 28 Ala. 629, 638 (1856) (emphasis added).
In addition to this Court’s explicit recognition in Waldron of Alabama’s adoption of England’s equity jurisdiction and jurisprudence as it existed before the American Revolution, this Court has also recognized the fundamental principles of that system as discussed by Blackstone and Story. See Tiger Motor Co. v. McMurtry, 284 Ala. 283, 287, 224 So.2d 638, 641 (1969) (“Our decisions do hold that equity jurisdiction cannot be invoked ... when complainant’s remedy at law, either by way of action or defense, is plain, adequate, and complete.”); Smith v. Roney, 182 Ala. 540, 543-44, 62 So. 753, 754 (1913) (“It is, of course, a truism that the system of equity jurisprudence was formed for the purpose of supplementing the law and of furnishing remedies for wrongs for which the law was, by reason of the unbending and inflexible character of its rules, unable to furnish a remedy. It therefore soon became a truism that, as a general rule, a court of equity would withhold relief to any suitor who possessed, for his particular wrong, a plain and adequate legal remedy.”); Saltonstall v. Gordon, 33 Ala. 149, 151 (1858) (citing Justice Story’s treatise for the proposition that equitable jurisdiction over fraud cases requires that the defrauded party must have a legal right, not just a moral right, to know the concealed information); and Henry v. Thompson, Minor 209, 233 (Ala.1824) (opinion of Saffold, J.) (applying “equitable construction” to a statute by interpreting it according to its “true spirit and design”). Thus, the principles espoused above by Blackstone and Story are not new to Alabama’s equity jurisprudence but, rather, provide the foundation for that jurisprudence.
C. Was Handley a Proper Exercise of Equitable Power?
With these principles in mind, I turn to the question whether Handley was decided correctly. Handley could have been decided correctly under only one of two circumstances: if it was decided on a recognized ground of equity, Tolar Constr., 944 So.2d at 152, or if it was a new application of true equitable power. Recognized grounds of equity include the common-fund doctrine, the substantial-benefit doctrine, contempt, and bad-faith litigation. John F. Vargo, The American Rule on Attorney Fee Allocation: The Injured Person’s Access to Justice, 42 Am. U.L.Rev. 1567, 1579-87 (1993); see also State Bd. of Educ. v. Waldrop, 840 So.2d at 897 (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc’y, 421 U.S. 240, 275, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (listing the same exceptions)). None of these grounds were at issue in Handley; therefore Handley cannot be justified by the recognized-grounds-of-equity exception to the American rule, which provides that, subject to certain exceptions, “all litigants, even the prevailing one, must bear their own attorney’s fees.” Black’s Law Dictionary 98 (9th ed. 2009).
The final question is whether Handley was a new application of true equitable power. As discussed above, equitable power is the power to apply a rule according to its spirit when the letter of the rule, by reason of its universality, goes beyond the spirit of the rule. 1 Blackstone, at *61-62. At common law, a party would typically bear his own fees unless a court of equity found that the losing party acted in an abusive manner or a common-law *761 court was authorized to grant fees by statute. Vargo, supra, at 1570-71. Thus, the common-law rule “mirror[s] the American Rule where the ‘loser’ is not responsible for the attorney’s fees of the “winner.’ ”[7] Id. at 1571. Thus, it appears to have been stated correctly that the purpose of the American rule is to treat attorney fees “as an element of court costs.” 20 C.J.S. Costs § 137 (2007).[8] Because each party must pay his or her own costs, it is inconsistent with the purpose of the American rule to require intervening grandparents who lost to pay the attorney fees of the parent who won. Thus, Handley was not a proper application of equitable power.
The grandparents mention briefly for the sake of argument that it might be possible to construe §§ 30-2-50 through -52, Ala.Code 1975, as granting a trial court authority to award attorney fees to a parent from a third party. (See petitioners’ brief, at 8.) If these statutes could be equitably construed in the manner described by the grandparents, then Hand-ley could be upheld. Those statutes provide:
“Pending an action for divorce, the court may make an allowance for the support of either spouse out of the estate of the other spouse, suitable to the spouse’s estate and the condition in life of the parties, for a period of time not longer than necessary for the prosecution of the complaint for divorce.”
§ 30-2-50, Ala.Code 1975.
“If either spouse has no separate estate or if it is insufficient for the maintenance of a spouse, the judge, upon granting a divorce, at his or her discretion, may order to a spouse an allowance out of the estate of the other spouse, taking into consideration the value thereof and the condition of the spouse’s family.”
§ 30-2-51(a), Ala.Code 1975.
“If the divorce is in favor of either spouse for the misconduct of the other spouse, the judge trying the case shall have the right to make an allowance to either spouse out of the estate of either spouse, or not make an allowance as the circumstances of the case may justify, and if an allowance is made, the misconduct of either spouse may be considered in determining the amount; provided, however, that any property acquired pri- or to the marriage of the parties or by inheritance or gift may not be considered in determining the amount.”
§ 30-2-52, Ala.Code 1975.
These statutes have been construed to allow an award of attorney fees “as expense money on like principles as alimony pendente lite.” Smith v. Smith, 57 Ala.App. 615, 330 So.2d 439 (Ala.Civ.App.1976).[9] In Blackstone’s example of the *762 ship, the purpose of the law was to encourage the sailors to preserve the ship. 1 Blackstone, *61-62. In this case, the purpose of §§ 30-2-50 through -52, Ala.Code 1975, is to preserve the marital obligation of support.
The Handley Court rejected the proposition that attorney fees arising out of divorce proceedings rest on the existence of a marital relationship and instead focused on the necessity of the parent to hire counsel. Handley, 460 So.2d at 169— 70. However, in light of the discussion above, it is clear that the Handley Court was mistaken. At best, the Handley Court confused the jurisprudential sense of equity — applying the law according to its purpose — with the generic sense of equity, which is synonymous with natural justice.[10] See 1 Story, supra, at § 34. However, the more likely explanation is that, as the Handley dissenters argued, Handley was a policy-based decision. See Handley, 460 So.2d at 170-71 (Torbert, C.J., dissenting) (arguing that Brock v. Brock, 281 Ala. 525, 205 So.2d 903 (1968), upon which the majority heavily relied, did not support the majority’s argument that necessity instead of the marital relationship was the basis for awarding attorney fees and concluding that “[t]he decision to award attorney fees in a case such as this is a reflection of a change of policy by this Court and should be recognized as such”).
Therefore, because Handley was not justified by the equitable principles on which it was supposedly based, it should be overruled.

IV. Conclusion

Ex parte Handley, 460 So.2d 167 (Ala. 1984), was not only an aberration from true equity jurisprudence but was also an attempt by this Court to make new law, which we are constitutionally forbidden from doing. Art. I, § 43, Ala. Const. 1901 (“[T]he judicial [department] shall never exercise the legislative and executive powers, or either of them; to the end that [the government of this state] may be a government of laws and not of men.”). Moreover, Handley ⅛ misunderstanding of equity has the potential to “destroy all law, and leave the decision of every question entirely in the breast of the judge,” which would “make every judge a legislator, and introduce most infinite confusion; as there would then be almost as many different rules of action laid down in' our courts, as there are differences of capacity and sentiment in the human mind.” 1 Blackstone, at *62. My hope is that the Court will be more open to overruling Handley upon a direct challenge in the future. However, because I believe that “[o]ur duty is to enunciate the law on the record facts” even though “none of the parties declaimed the applicable law,” Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d at 960, and because I believe that enunciating the law on the factual record of this case would require overruling Handley, I respectfully dissent.

. The Court also invited an amicus curiae brief from the Alabama Chapter of the American Academy of Matrimonial Lawyers, which declined because the attorneys on both sides of this case were members of that chapter.

. It is true that this Court ordinarily is “disinclined to overrule controlling precedent when it is not invited to do so.” Moore v. Prudential Residential Servs., 849 So.2d 914, 926 (Ala.2002) (emphasis added), but that does not mean that it is improper to do so. On the contrary,
"[a]ppellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below. Our duty is to enunciate the law on the record facts. Neither the parties nor the trial judge, by agreement or passivity, can force us to abdicate our appellate responsibility.” ’ "
Hodurski, 899 So.2d at 960 (quoting Forshey, 284 F.3d at 1357 n. 20, quoting in turn Empire Life Ins. Co., 468 F.2d at 334 (emphasis added)). See also Travelers Indem. Co. of Connecticut v. Miller, 86 So.3d 338, 347 (Ala.2011) (overruling a case while expressly noting that the Court had not been asked to do so); Ex parte J.E. Estes Wood Co., 42 So.3d 104, 112 (Ala.2010) (Lyons, J., concurring specially) (noting that this Court had overruled a case without being asked); and Ex parte Carter, 889 So.2d 528, 533 (Ala.2004) (overruling cases the petitioner attempted to distinguish but did not ask the Court to overrule, along with several other cases). In this case, because Handley forms the jurisprudential basis for the erroneous decision below, I believe this Court is free to overrule Handley even without the request of the parties in this case to do so.

. The paternal grandparents filed their petition for certiorari review first, and we granted their petition. The. maternal grandparents later petitioned for certiorari review. We granted that petition and consolidated their petition with the paternal grandparents’ petition.

. This Court has used the phrases "recognized grounds of equity” and "special equity” interchangeably with “recognized equity principles.” See, e.g., City of Birmingham v. Horn, 810 So.2d 667, 679-80 (Ala.2001) (using the phrase “special equity”); Ex parte Martin, 775 So.2d 202, 206 (Ala.2000) (using the phrase "recognized grounds of equity”).

. "The law does not define exactly, but trusts in the judgment of a good man.” Black’s Law Dictionary 1844 (9th ed. 2009).

. United States Supreme Court Associate Justice Clarence Thomas has cited this passage in making a similar point:
"Throughout his discussion, Blackstone emphasized that courts of equity must be governed by rules and precedents no less than the courts of law. '[I]f a court of equity were still at sea, and floated upon the occasional opinion which the judge who happened to preside might entertain of conscience in every particular case, the inconvenience that would arise from this uncertainty, would be a worse evil than any hardship that could follow from rules too strict and inflexible.’ [3 William Blackstone, Commentaries ], at 440. If their remedial discretion had not been cabined, Blackstone warned, equity courts would have undermined the rule of law and produced arbitrary government. 'The judiciary’s powers would have become too arbitrary to have been endured in a country like this, which boasts of being governed in all respects by law and not by will.’ Ibid. (footnote omitted); see also 1 id., at 61-62.”
Missouri v. Jenkins, 515 U.S. 70, 127-28, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring).

. The modem English rule that the loser pays the winner's fees did not develop until after America gained independence. See id.

. It has also been said that the purpose of the American rule "is to avoid stifling legitimate litigation by the threat of the specter of burdensome expenses being imposed on an unsuccessful party.” 20 Am.Jur.2d Costs § 55 (2005). See also Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) (arguing "in support of the American Rule” that one should not be discouraged from prosecuting or defending against a suit because of the uncertainty of litigation, that the poor might be unjustly discouraged from defending their rights for fear of paying their opponents’ fees, and that determining “reasonable attorney’s fees” in every case would unduly burden judicial administration). Although these arguments present the positive benefits conferred by the American rule, these arguments do not explain why the rule exists.

.One of the cases cited in Smith was Ex parte Smith, 34 Ala. 455 (1859). However, Ex parte Smith held that courts of equity historically had authority to grant attorney fees from one spouse to another independent of the previous versions of §§ 30-2-50 through -52, Ala.Code 1975. 34 Ala. at 458-59. The basis of this historical equitable rule was the marital rela *762 tionship. Id. See also Peacock v. Peacock, 264 Ala. 332, 334, 87 So.2d 626, 628 (1956) (citing Ex parte Smith).

. I express no opinión as to whether a parent has a moral right to have an intervening third party pay that parent's attorney fees.